And we will go to the next case on the calendar, Daniel Magdaleno v. Washington County. Good morning, Your Honors. William Lader for Appellant Daniel Magdaleno. I'd like to start this morning just by pointing out that from the record before us, we can see that Daniel Magdaleno was abused as a child between the ages of 4 and 11, that he was diagnosed as a result of that abuse in 2001 with post-traumatic stress disorder, that the symptoms of that PTSD included mood swings, heavy risk-taking, alcohol abuse, anxiety, depression, and sleeplessness, and that it affected both his personal and professional interactions with other people, which in our case is the disability we're alleging or the major life activity that was substantially affected in this case. Counsel, there's no question, I think, in the record that your client was a very troubled man. But it also appears, as I read the record, that he was being treated for his various issues. He received medication for them, and according to the record, when he took his medication, he performed quite well and, in fact, was considered an exemplary employee. And then, mysteriously, he wouldn't take his medication. And then when he didn't take his medication, he became far less than an exemplary employee. And then he would take his medication again, and he would be okay. So how are we to view this situation where it appears, at least to me from the record, that your client's problems are almost, if you will, in a sense, self-directed? In other words, while his underlying issues are certainly something that one might say are beyond his control, he's like the individual who chooses not to be well for trial by saying, I don't want to take my medication. And he takes his medication. He's okay. He becomes an exemplary law enforcement officer. He doesn't take his medication. He doesn't do his reports. He doesn't show up on time. Then he takes his medication again, and he's great, although he did appear to have some problem with getting his reports in on time. I don't think that there's anything in the record, Your Honor, that specifically correlates one-to-one. He took his medication this day and did fine. He didn't take his medication. Well, I remember reading somewhere in the record that he had been off his medication and went back on, and I believe it was his wife who was saying that he was, quote, unquote, a much better, different person, doing well. Your Honor, you're exactly right. When he was taking his medication, he was better. I don't think that there's anything in the record that indicates that he was well when he was taking his medication and that on and off he would feel he was better, lower his dosage of medication, get worse again. That's what I'm saying. He was kind of self-directing his own demise, if you will, and then he would get to a point and he'd kind of jump back up to where he was supposed to be or maybe the doctor would talk. I don't know. Who knows? But he would do better, and then he would get to a point where he then would decide he was better, which is not an uncommon thing with people who have mental illness. They get better because they're on their medication, feel they're better, and they stop taking their medication, in which case they then get worse. True. And there was a meeting in December of 2001 at which the plaintiff discussed all of this with his commander, decided that at this December of 2001 meeting, this is where I go with full disclosure and all my PTSD is going to come out in the open here. Now this is alcohol issues and so forth. And discusses that with his commander, and the commander at that point decides to do a fitness for duty exam, sends him to a doctor, and the doctor recommends that he be taken off his regular assignment and put into a more light-duty assignment. At the same time, Commander Hildreth directed several sergeants to gather information about the activities of Mr. Magdaleno over the past few months and document any abnormal behaviors. And he received three memos back regarding Mr. Magdaleno's behaviors. And in spite of the doctor's recommendation that Magdaleno go on the light duty, Hildreth decides to put him back in the line of fire and puts him back on his regular assignment. But didn't the doctor, I don't know whether it was this visit, I think it was, say that he had no disability? Was it this visit? Yeah, he expressed a legal opinion, which I think can be taken for granted. Well, but I know that that opinion was expressed to his boss, who told his boss, well, he's not disabled, he's fit for duty. So the boss didn't just say, well, just put him back in there. Well, he did, though, because the doctor recommended that he go off of his high-stress street job and into a more paper-processing position, at least temporarily. Well, he had been doing that, though. He had been in a lighter-duty situation for a while. Maybe a week or two, but not more than a week or two. At any rate, Dr. Corey recommended that... Anyway, I don't want to take up your time. Go ahead. That's okay. Dr. Corey recommended that Magdaleno go on this light-duty assignment, which his commander just decided not to do, and, like I said, put him back out on the street in the high-stress position, which led to the phenomenon that you were talking about before, where he would go on and off his meds, depending on how he felt that week or that month. Part of the problem is it looks like, from the very beginning to the very end, his real continuing problem was he wouldn't do reports. He just wouldn't do reports right. Now, the people are sloppy on paperwork, and they just are, whether they have post-traumatic stress syndrome or whatever they have, they just are sloppy on paperwork. And this guy looks like he's continually sloppy on paperwork. They say he's wonderful, he's relating to people, people commend him for what a terrific guy he is. He can't get his paperwork done, though. Your Honor, I believe that that's a red herring, and there is testimony of the effect that they didn't know. Nobody knew whether Officer Magdaleno was any better or any worse at that paperwork that they were disciplining him for than anybody else. Well, when they were giving very high ratings along the way, they always had, he's got to get his paperwork done, he's not doing his reports. Am I right? Like I said, there was no evidence from the other side that Officer Magdaleno was any more delinquent than anybody else was. Is that the standard? Are you saying that unless the moving party shows that he was worse than others, they couldn't use the fact that he doesn't do his reports? Well, I'm saying that that raises an issue of fact as to whether or not. That goes to the third element as to whether the fact that he didn't do his reports was a pretext. Is that what you're saying? Yes, that is what I'm saying. Well, where is your evidence, because the burden of proof is on you on the third stage of the McDonnell-Douglas test after a legitimate reason is given for the adverse employment action. Where is your evidence that there were other people who did bad reports or no reports, but they were not disciplined? Well, what we're saying is that the failure of the defendant to accommodate. But the burden of proof is on you to show that that's a pretextual reason, as I understand the law. If there had been some reasonable accommodation efforts made, that would be true. The reasonable accommodation should be that he doesn't have to do reports? No. The reasonable accommodation was to take the stress off him, as the doctor had recommended. Could I reserve the remainder of my time? Sure. Thank you. Good morning. Bill Blair for Defendant Washington County. The Court has already commenced on some core questions in this case, the first being whether or not the plaintiff did, in fact, have a disability. The disability, he claims, is that of inability to interact with others. And there are two, then, questions that have to be resolved. First is, was there, in fact, a disability? And second, if not, was he perceived by his employers as having a disability? As to the record on summary judgment is clear on both counts, that not only did he not have a disability of interacting with others, but he was not perceived as having such a disability, in that his employers put him in a position of being a patrol deputy on the road, dealing with citizens on traffic violations as criminal defendants, as witnesses or victims of crime, in all of which he did a good job of doing that interaction. Well, he had some issues. I mean, I think one time he drove his car off the road, down a hill and into a tree, and nobody kind of quite knew why. And then, I think as Judge Fernandes pointed out, he wasn't getting his paperwork in properly. He acted a little spaced out. Some people were suggesting that he appeared a little bizarre. I don't know if that was the word that was used, but similar words were used. The incident of driving his car off the road, I have seen nothing in the record that suggests that is in any way related to interacting with others. And as far as the other issues, I think that the timeline here is important, because it's between the period of 1999 and 2002, when he finally realized in his own testimony that he did have problems and he needed to get a handle on them, get them under control. That period between 1999 and 2002 was, as he regarded it, the worst period of his life. And during that period of time, he continued to function effectively as a patrol deputy, again with problems of writing reports. The issue of writing reports is one that, again, there is no evidence that ties that to his post-traumatic stress disorder or ability to interact with others. Well, how do we treat it if he's got a condition which hampers his ability to interact effectively with other people, but that is cured by medication, which he takes and is fine, but then doesn't take and is not fine? I think the cases are clear that... Does he have an obligation to take his medicine? ...cured by medication, is not disabled. So in your view, he has an obligation to take his medicine, basically. He does, yes. So he can't just go off his medicine and say, I'm now disabled. No, he can't, and be protected by the American Disabilities Act. In that period, the 1999 to 2002 period, he was having problems getting his reports done on time and was, in fact, given direct and specific orders by two sergeants. This is the plan you will follow on penalty of discipline for getting your reports done and following the required procedures of the Washington County Sheriff's Office. When he put his mind to it, he was capable of doing that. It was not until after that period when he says by his own testimony he had things under control, he again started falling off on his report writing. I see nothing in the record that ties that to medication. I see nothing in the record that ties that to post-traumatic stress disorder. What, in fact, he was doing was not completing reports according to the specific instructions and orders that he had been given, with the result that on one occasion, the Washington County District Attorney had to dismiss a stalking case because he did not have the police report in order to base the prosecutorial action to carry the case forward. That was itself insubordination. He had been given specific orders. He testified that he didn't regard that as a specific order, notwithstanding the fact that the written order given to him said, that this is an order, you will be disciplined if you do not follow it. The problems that he had were largely of his own making. They were largely problems resulting not from post-traumatic stress disorders, but the only evidence in the record that we can see is Dr. Corey's analysis that these are problems resulting from inherent personality traits and characteristics of Mr. Magdaleno, not the post-traumatic stress disorder. He was evaluated on fitness for duty twice. The first had already been discussed. The second was after he drove his car off the road. His treating counselor thought maybe that would be an indication of some underlying psychological problem worse than post-traumatic stress disorder, and so he was referred to Dr. Corey for an evaluation. His counselor is a licensed clinical social worker. Dr. Corey is the psychologist retained by the Washington County Sheriff's Office to do fitness for duty evaluations. And again, what Dr. Corey found was not that the car off the road resulted from anything that did not render him fit for continued duty as a sheriff's deputy. He was then placed back on patrol status, although he was on a performance plan. He had been off work for a while. Did they make any finding as to why he drove the car off the road? I do not believe that there was a definitive answer to that question, Your Honor. On one occasion, as counsel points out, Dr. Corey seconded a recommendation from Mr. Magdaleno's treating social worker that he be given light duty. That was not in the context of an accommodation for disability, and in fact, what was done was not he was put back out on the road in the same assignment. What was done was instead he was reassigned to a patrol shift on day shift, a time when he would not have the high volume of criminal and traffic issues of swing and graveyard shift and when he could be doing. My recollection from the record was that he actually did not get the same work assignment that he had previously had, which would have been a mixture of night and day. Well, there were two occasions. Number one is when he was put on to a day shift assignment, and number two he was put for a period of time on to a telephone report taking assignment. Right, that was for the couple of weeks. Yes. Right. If there are no further questions, I have nothing to add. Thank you. I just wanted to point out that in Mr. Magdaleno's affidavit or declaration testimony, he explains why that transfer to day shift did not decrease his workload but increased it because he had to deal with the ongoing internal affairs investigations and was given follow-up investigations from the other shifts, which couldn't be done except during the day shift. And I think in summary, if the court reviews the language in the opening brief at page 8 from the Head v. Glacier case regarding interacting with others and then compares it with what was going on in this case, it's close enough that this should not have been dismissed as summary judgment. Thank you, Your Honor. Thank you, sir. Thank you, both counsel. And the case of Magdaleno v. Washington County will be submitted.
judges: Fernandez, Bea, Ezra